**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Lenox Group, Inc. (f/k/a Department 56, Inc.,) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 294 |
| v. | ) | |
| | ) | Hon James B. Zagel |
| Just Ducky Ltd.; Beverly Donofrio; Darren | ) | |
| Donofrio; Lori Donofrio; and Brandon Donofrio, | ) | |
| | ) | |
| Defendants. | ) | |

**LENOX GROUP, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**RULE 12(F) MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES**

**INTRODUCTION**

On January 14, 2008, Lenox Group, Inc., f/k/a Department 56, Inc. ("D56") filed its

Complaint against Just Lucky, Inc., Beverly Donofrio, Darren Donofrio, Lori Donofrio and

Brandon Donofrio (the "Defendants") to recover $385,000 due in connection with products

Defendants received from D56, but for which Defendants have refused to pay.  On March 25,

2008, Defendants filed their Answer to the Complaint, which includes two affirmative defenses:

fraud and duress/coercion.  Essentially, Defendants claim that the personal guarantees D56

attached to the Complaint are not authentic, or in the alternative, if Defendants did sign the

guarantees, they did so under duress.  However, Defendants failed to plead either defense with

the particularity required under the Federal Rules of Civil Procedure, and instead merely assert

the very type of "bare bones" conclusory allegations which should be stricken to clear

unnecessary clutter from what is otherwise a simple collection matter.

## LEGAL STANDARD

Affirmative defenses are subject to all pleading requirements of the Federal Rules of Civil Procedure. *Heller Fin. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294-95 (7th Cir. 1989); *Sanwa Bus. Credit Corp. v. Harris*, No. 91 C 0204, 1991 WL 156116 (N.D. Ill. 1991) (Zagel, J.). An affirmative defense of fraud must not only be pleaded, but "must state with 'particularity' the circumstances surrounding the fraud." *Sanwa*, at *2; FED. R. CIV. P. 8(c) & 9(b) (West 2008). Generally, a party claiming fraud must allege: "(1) the identity of the person who made the misrepresentation; (2) the time, place, and content of the misrepresentation; and (3) the method by which the misrepresentation was communicated." *Viacom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). "Mere conclusory language which asserts fraud, without a description of fraudulent conduct, does not satisfy Rule 9(b)." *Carpenters Fringe Benefit Funds of Ill. v. Southern Ill. Lumber Co.*, No. 91 C 7641, 1992 WL 175505 at *3 (N.D. Ill. 1992) (citing *D&G Enterp. v. Continental Ill. Nat'l Bank*, 574 F. Supp. 263, 267 (N.D. Ill. 1983)).

Federal Rule of Civil Procedure 12(f) allows a court to strike any affirmative defense which is insufficient on the face of the pleadings. FED. R. CIV. P. 12(f)(West 2008); *Williams v. Jader Blue Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991); *Heller*, 883 F.2d at 1294. "[I]n examining each of the affirmative defenses challenged in a motion to strike, [the court] must consider the following:

> (1) whether the matter is properly pleaded as an affirmative defense;
> (2) if the matter is properly an affirmative defense, whether it is adequately pleaded under the requirements of Rules 8 and 9; and finally
> (3) whether an affirmative defense meeting the first two conditions will also withstand a Rule 12(b)(6) challenge."

*Sanwa*, at *2 (Zagel, J.). "'If it is impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the Complaint, the matter will be stricken as legally

insufficient.'"  *Id.* (quoting *Bobbit v. Victorian House, Inc.*, 532 F. Supp. 734, 737 (N.D. Ill.

1982).  Accordingly, affirmative defenses consisting of "nothing but bare bones conclusory

allegations" are meritless, and should be stricken to "remove unnecessary clutter from the case."

*Heller*, 883 F.2d at 1294-95.


**ARGUMENT**

**I.    DEFENDANTS' FIRST AFFIRMATIVE DEFENSE FAILS TO PLEAD FRAUD
WITH THE PARTICULARITY REQUIRED UNDER RULE 9(B).**

Defendants' First Affirmative Defense alleges that the Defendants "have no recollection

of ever signing and executing" the personal guarantees D56 attached to the Complaint, and that

"one Defendant, Beverly Donofrio, asserts that the notarized personal guarantee allegedly signed

by her is not her signature."  Defs.' Answer ¶¶ 32, 33.  Defendants further allege that the

personal guarantees attached to the Complaint were notarized without their "knowledge and/or

permission."  *Id.* ¶ 31.  Defendants conclude that "the notarized personal guarantees produced by

[D56] and attached as exhibits to its Complaint are fraudulent documents and cannot be used as

evidence in this matter."  *Id.* ¶ 34.  Even taken as true, this is not fraud.

In *Compania Administradora v. Titan Int'l, Inc.*, the defendant raised fraud as an

affirmative defense to the plaintiff's debt collection action, claiming that the exhibits the plaintiff

attached to its complaint consisted of a forged guaranty, and promissory notes that contained

inauthentic signatures.  No. 05-3071, 2005 WL 3021976 at *2 (C.D. Ill. 2005) (attached as A).

Further, the defendant alleged that the guaranty was the "result of fraud and/or was fraudulently

induced and based upon misrepresentations made to defendants concerning the terms of the

alleged guaranty."  *Id.*  The court held that the allegations that the guaranty was forged and the

promissory notes contained inauthentic signatures need not be plead with particularity, but the

fraud claim within that affirmative defense must be stricken for failure to plead a claim of fraud with sufficient particularity – because the defendant did not allege any details about any misrepresentations made to its representatives.  *Id.*   Therefore, the court ruled that although the defendant could assert that the guaranty was a forgery and the signatures were not authentic, the affirmative defense of fraud must be stricken.  The same result is required here.

Like the defendant in *Titan*, Defendants here have not alleged fraud, but merely allege that the personal guarantees D56 attached to its complaint contain inauthentic signatures. Nowhere in the First Affirmative Defense have Defendants alleged even the conclusion that D56 perpetrated a fraud on them (indeed, Defendants allege that the guarantees are "fraudulent documents," not that D56 defrauded them), let alone who made any alleged misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated.  Accordingly, Defendants' First Affirmative Defense must be stricken for failing to allege fraud with the particularity required under Rule 9(b).[1]

## II.    DEFENDANTS' SECOND AFFIRMATIVE DEFNSE FAILS TO SUFFICIENTLY PLEAD DURESS/CORECION.

Defendants' Second Affirmative Defense alleges that D56 knew that Defendants were a "small family run business that depended in large part on receiving supplies from [D56]," and that "on several occasions [D56] promised to deliver product to Defendants knowing Defendants would rely on the delivery of same and then at the last minute forced Defendants to sign documents on the spot without letting them review their content."  Defs.' Answer ¶¶ 37-38, 40. Defendants further allege that "they were left with no option but to sign the documents in order

---

[1] To the extent that Defendants did not intend their First Affirmative Defense as an actual claim of fraud against D56, but merely intend to put D56 on notice of their defense that the personal guarantees are not authentic, Defendants' First Affirmative Defense should nonetheless be stricken as redundant.  Defendants provide ample notice to D56 of their intended defense within the text of their Answer.  *See* Defs.' Answer ¶¶ 11, 17, 20, 23 and 26 (denying that Defendants executed the personal guarantees attached to the Complaint).

to receive their product and stay in business." *Id.* ¶ 41. Defendants conclude that "if any personal guarantees in [D56's] possession do contain a genuine signature of one of the Defendants, there is no question that it was signed during a state of duress and because of [D56's] coercive tactics." *Id.* ¶ 43. However, even taking these allegations as true, Defendants have nonetheless failed to allege facts sufficient to support the affirmative defense of duress/coercion.

"Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will." *Resolution Trust Corp. v. Ruggerio*, 977 F.2d 309, 313 (7th Cir. 1992). "Of course, '[d]uress is not shown by the fact that one was subjected to . . . a difficult bargaining position or the pressure of financial circumstances.'" *Id.* at 313-14 (quoting *Herget Nat'l Bank v. Theede*, 181 Ill. App.3d 1053, 537 N.E.2d 1109, 1111 (1989) ("The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions.")). "Further, the pressure applied must have been wrongful or unlawful; mere hard bargaining is not enough." *Id.* at 314 (citing *FDIC v. Linn*, 671 F. Supp. 547, 556, 559 (N.D. Ill. 1987)).

In *Pre-Press Graphics Co., Inc. v. Brides Noir*, the defendant raised economic duress as an affirmative defense to the plaintiff's adversary action to collect money owed on a breached contract and breached personal guarantees. 310 B.R. 905 (Bankr. N.D. Ill. 2004) (attached as B). The defendants testified that although they chose plaintiff to print their magazine because plaintiff did not require money up front, after starting the job, and shortly before the launch party for the magazine, plaintiff demanded $10,000 up front and sent the defendant a contract and personal guarantees that had to be signed before plaintiff would finish printing the magazine. *Id.* at 917. Defendants further testified that they only signed the contract and guarantees because

"they felt forced to reach some sort of agreement." *Id.* The court held that none of that testimony established any wrongful or unlawful conduct because the plaintiff "had the legal right to bargain for the best possible terms in exchange for its printing services, including demanding that Defendants sign a written contract and assume personal liability in connection with the payment of those services." *Id.* The court further held that "Defendants should not have expected Pre-Press to perform without some assurance that it would be paid," and "[t]he fact that Pre-Press may have engaged in hard bargaining is not sufficient to constitute a wrongful act for purposes of establishing economic duress." *Id.* at 917-18. Accordingly, the court ruled that the defendants could not rely on economic duress as a defense to enforcement of the contract or the personal guarantees. The same result is required here.

The facts alleged by Defendants in this matter closely mirror the facts alleged by the defendants in *Pre-Press Graphics*. Defendants in this matter have alleged no wrongful or illegal conduct by D56, but merely alleged that D56 insisted that Defendants sign personal guarantees before it would deliver merchandise to the Defendants, and that Defendants felt pressure to sign those personal guarantees because they were in a difficult financial situation. D56 had every legal right to seek assurance that it would be paid for its products, and every right to insist that Defendants sign personal guarantees, even if execution of those guarantees was the result of hard bargaining by D56. Clearly, Defendants have not alleged facts, which if proven, would establish that the guarantees were obtained as the result of any wrongful or unlawful conduct, including economic duress or coercion. Therefore, Defendants' Second Affirmative Defense must be stricken as well.

## CONCLUSION

For the foregoing reasons, Lenox Group, Inc. respectfully requests that this Court strike

all of Defendants' Affirmative Defenses, with prejudice, and for such other relief as the Court

deems just and proper.


Dated:  April 10, 2008                          Respectfully submitted,

                                                LENOX GROUP, INC.
                                                (f/k/a DEPARTMENT 56, INC.)

                                                By:   /s/ William S. Booth
                                                      One of Its Attorneys

                                                Andrew G. Klevorn (aklevorn@eimerstahl.com)
                                                William S. Booth (bbooth@eimerstahl.com)
                                                Eimer Stahl Klevorn & Solberg LLP
                                                224 S. Michigan Avenue, Suite 1100
                                                Chicago, IL 60604
                                                (312) 660-7600
                                                (312) 692-1718 (Fax)

                                                ATTORNEYS FOR LENOX GROUP, INC., (f/k/a
                                                DEPARTMENT 56, INC.)

**Exhibit A**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3021976 (C.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Compania Administradora de Recuperacion de
Activos Administradora de Fondos de Inversion
Sociedad Anonima v. Titan Intern., Inc.
C.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,C.D. Illinois.
COMPAÑÍA ADMINISTRADORA DE
RECUPERACIÓN DE ACTIVOS
ADMINISTRADORA DE FONDOS DE
INVERSIÓN SOCIEDAD ANÓNIMA, Plaintiff,
v.
TITAN INTERNATIONAL, INC., Defendant.
No. 05-3071.

Nov. 10, 2005.

Paul R. Bown, Brown, Hay & Stephens, Springfield,
IL, Richard L. Fenton, Steven L. Merouse,
Sonnenschein, Nath & Rosenthal, Chicago, IL, for
Plaintiff.
Charles H. Carpenter, Edward M. Andries, Pepper
Hamilton LLP, Washington, DC, for Defendant.

*OPINION*

SCOTT, J.
**\*1** This matter comes before the Court on Plaintiff
Compañía Administradora de Recuperación de
Activos Adminstradora de Fondos de Inversión
Sociedad Anónima's (Bank) Motion to Strike
Defendant Titan International, Inc.'s (Titan) Fourth
and Fourteenth Affirmative Defenses (d/e 16)
(Motion to Strike). For the reasons set forth below,
the Motion is ALLOWED, in part, and DENIED, in
part. A portion of the Fourteenth Affirmative Defense
is stricken, but the remainder of the Motion is denied.

The Bank has brought this action against Titan to
collect on a written guaranty (Guaranty) of the debts
of a Uruguayan company known as Fábrica
Uruguaya de Neumáticos, S.A. (FUNSA).*Complaint
(d/e 1).* The Bank attached to the Complaint copies of
the Guaranty and the underlying promissory notes, all
written in Spanish, along with English translations.
*Complaint,* Exhibits A and B.

Titan alleges as its Fourth Affirmative Defense that

the person signing the Guaranty on behalf of Titan
(identified on the Guaranty as Gary L. Carlson, Vice
President) lacked authority to sign the Guaranty on
behalf of Titan because he was not an officer of
Titan. *Amended Answer. Affirmative Defenses and
Demand for Jury Trial (d/e 13) (Amended Answer)* at
3.

Titan alleges as its Fourteenth Affirmative Defense
that the Guaranty was a product of fraud. Titan
alleges that: (1) the Guaranty itself is a forgery (the
Forgery Defense); (2) that if the document is not a
forgery, then Titan has reason to believe that FUNSA
and/or the Bank's predecessor, Banco de La
República Oriental de Uruguay (BROU), engaged in
fraud to induce Titan's representative to sign the
Guaranty (the Fraud Defense); and (3) Titan has
reason to believe that the signatures of FUNSA
officers on the underlying loan documents are not
authentic (the Authentication Defense).*Id.* at 5-8.

The Bank asks the Court to strike these defenses. A
party may move to strike, "any insufficient defense or
any redundant, immaterial, impertinent, or
scandalous matter," from any pleading. *Fed.R.Civ.P.
12(f).* Motions to strike, however, are disfavored and
should only be granted when a defense is clearly
insufficient on the face of the pleadings. *Heller
Financial, Inc. v. Midwhey Powder Co., Inc.,* 883
F.2d 1286, 1294 (7th Cir.1989); *Imperial Const.
Management Corp. v. Laborers' Intern. Union of
North America, Local 96,* 818 F.Supp. 1179, 1186
(N.D.Ill.1993).[FN1] The Fraud Defense is insufficient
on its face, but the other defenses are sufficiently
pled.

> FN1. The assertions that: (1) Carlson lacked
> authority to bind Titan; (2) the Guaranty is a
> forgery; and (3) the signatures on the
> underlying loan documents are not
> authentic, arguably, may not be affirmative
> defenses because these assertions dispute
> elements of the Bank's *primafacie* case on
> which the Bank may have the burden of
> proof, *i.e.,* that Titan effectively executed
> the Guaranty and the underlying guaranteed
> obligations exist. *SeeBrunswick Leasing
> Corp. v. Wisconsin Cent., Ltd.,* 136 F.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

521, 530 (7th Cir.1998) ("The appropriate analysis for determining what falls into the 'any other' category [of affirmative defenses not specifically listed in Rule 8(c) ] is not well settled, especially in diversity cases."). The Bank, however, does not challenge these defenses on these grounds, and, because motions to strike are disfavored, the Court will not address this issue.

A. *Fourth Affirmative Defense*

The Bank submits a Titan corporate resolution to prove that Carlson had authority to bind Titan. *Memorandum in Support of Plaintiff's Motion to Strike Defendant's Fourth and Fourteenth Affirmative Defense, (d/e 17),* Exhibit A. The Court again is outside the pleadings. The Court will not go outside the face of the pleadings to evaluate the Affirmative Defense. *Heller Financial,* 883 F.2d at 1294. The Bank may raise the corporate resolution at summary judgment or at trial to prove Carlson's authority to bind Titan. At this point, the Court must assume Titan and its counsel have made reasonable inquiry and have a good faith basis for pleading this defense. *See* Fed.R.Civ.P. 11(b). The defense will not be stricken.

B. *The Fourteenth Affirmative Defense*

**\*2** The Bank asks the Court to **strike** this defense because the claim of **fraud** is not pleaded with particularity. An **affirmative defense** of fraud must be pleaded, and must be pleaded with particularity. Fed.R.Civ.P. 8(c) & 9(b). Generally, a party claiming fraud must allege: (1) the identity of the person making the misrepresentation; (2) the time, place, and content of the misrepresentation; and (3) the method by which the misrepresentation was communicated. *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 777 (7th Cir.1994). A party may be relieved of the obligation to plead fraud with particularity if: (1) the facts are inaccessible, and (2) the party sets forth the grounds for the suspicion of fraud. *Corley v. Rosewood Care Center, Inc.,* 142 F.3d 1041, 1050 (7th Cir.1998); *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 684 (7th Cir.1992).

The Forgery Defense and the Authentication Defense, within the Fourteenth Affirmative Defense, do not allege that anyone defrauded Titan. Rather,

these portions of the Fourteenth Affirmative Defense allege that the Bank submitted to the Court to support its Complaint: (1) a forged Guaranty; and (2) promissory notes that contain signatures that are not authentic.[FN2] These allegations do not require proof of fraud, and as such, do not need to be pleaded with particularity. The allegations are sufficient to give the Bank notice of these two defenses. Fed.R.Civ.P. 8(b). The Court again must assume that Titan and its counsel made reasonable inquiry and have a good faith basis for making these allegations in its pleading. *See* Fed.R.Civ.P. 11(b). The Court, therefore, will not strike them.

> FN2. The Fourteenth Affirmative Defense uses the term "loan documents" rather than promissory notes. It is conceivable that Titan is alleging that some other loan documents not attached to the Complaint, rather than the attached promissory notes, contain the signatures that are not authentic.

The Fraud Defense, within the Fourteenth Affirmative Defense, however, is a claim of fraud. Titan claims that the Guaranty, "is the result of fraud and/or was fraudulently induced and based upon misrepresentations made to defendant concerning the terms of the alleged guaranty, including terms relevant to duration and type of liability, with the written terms not reflecting any agreement made by the defendant...." *Amended Answer* at 6. Titan alleges that it has a policy not to guarantee contracts for more than 12 to 15 months, but the Guaranty, by its terms, is for an unlimited duration. Titan further alleges that it was never given an English version of the Guaranty. Titan alleges, on information and belief, that representatives of BROU misrepresented the contents of the Guaranty, written in Spanish, to induce Titan's representatives to execute the Guaranty. *Id.* Titan further alleges, on information and belief, that representatives of BROU represented to Titan's representatives that Titan would be able to proceed against FUNSA's assets in the event of a default. Titan alleges that this representation was false. *Id.* at 7.

Titan does not allege these claims of fraud with sufficient particularity. Titan does not allege any details about any representations made to its representatives regarding the duration of the Guaranty or Titan's right of recourse against

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3021976 (C.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

FUNSA's assets. Titan states that it does not have the facts on which to allege the representations with particularity because it does not have access to the records or personnel of FUNSA. Titan does not need access to the records or the personnel of FUNSA to allege the nature of the misrepresentations with particularly. The misrepresentations were made to Titan's representatives. Titan need only ask its own representatives involved in the transactions to learn the details of the misrepresentations. Titan, therefore, does not need discovery from FUNSA to allege the misrepresentations with particularly. Titan has not done so. The Fraud Defense within the Fourteenth Affirmative Defense is stricken. Titan may, however, assert that the Guaranty is a forgery and that the signatures of the FUNSA officers on the underlying loans documents are not authentic.

**\*3** Titan asks the Court to strike the Fraud Defense without prejudice. The Court does not need to do this. This is an interlocutory order. Should Titan develop facts in discovery on which it can base an affirmative defense of fraud, it may file a motion for leave to amend its pleadings. The Court will evaluate any motion to amend at the time that it is made under the circumstances then existing. *See* *Fed.R.Civ.P. 15(a),* *16(b)(1) & (c)(2).*

THEREFORE, Plaintiff Compañía Administradora de Recuperación de Activos Adminstradora de Fondos de Inversión Sociedad Anónima's Motion to Strike Defendant Titan International, Inc.'s Fourth and Fourteenth Affirmative Defenses (d/e 16) is ALLOWED, in part, and DENIED, in part. The Court denies the request to strike the Fourth Affirmative Defense. The Court denies the request to strike those portions of the Fourteenth Affirmative Defense that allege: (1) the Guaranty is a forgery; and (2) the signatures of FUNSA officers on the underlying loan documents are not authentic. The Court strikes the remainder of the Fourteenth Affirmative Defense.

IT IS THEREFORE SO ORDERED.

C.D.Ill.,2005.
Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Intern., Inc.
Not Reported in F.Supp.2d, 2005 WL 3021976 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit B**



**H**In re Pre-Press Graphics Co., Inc.
Bkrtcy.N.D.Ill.,2004.

United States Bankruptcy Court,N.D. Illinois,Eastern
Division.
In re PRE-PRESS GRAPHICS COMPANY, INC.,
d/b/a R & B Group, an Illinois Corp., Debtor.
Pre-Press Graphics Company, Inc., d/b/a R & B
Group, an Illinois Corp., Plaintiff and Counter-
Defendant,
v.
Brides Noir, LLC, Dana Powell, and Shannon
Bonner, Defendants and Counter-Plaintiffs.
**Bankruptcy No. 02 B 08292.**
**Adversary No. 03 A 04400.**

June 22, 2004.

**Background:** Chapter 11 debtor/printing company
brought adversary proceeding to recover from its
customers for their alleged breach of contract in
failing to make payments required for magazine
production work.

**Holdings:** The Bankruptcy Court, John H. Squires,
J., held that:
(1) parties who had entered into contract with
printing company for production of inaugural issue of
new magazine were bound by unambiguous terms of
their written contract, and could not introduce
evidence of any contrary representations allegedly
made during contract negotiations;
(2) would-be publishers failed to satisfy their burden
of proving that printing contract should be
invalidated for economic duress;
(3) evidence was sufficient to establish that
debtor/printing company had fulfilled its own
contractual obligations; and
(4) customers failed to satisfy burden of showing, as
required to support to support their counterclaim, that
debtor breached its contractual obligation to perform
work in good and workmanlike fashion.

Judgment for debtor; counterclaim dismissed.

West Headnotes

**[1] Bankruptcy 51 ☞3101**

51 Bankruptcy
    51IX Administration
        51IX(C) Debtor's Contracts and Leases
            51k3101 k. In General. Most Cited Cases
State law determines rules governing contractual
disputes in bankruptcy.

**[2] Contracts 95 ☞326**

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of Action. Most Cited
Cases
Under Illinois law, action for breach of contract
requires proof of four elements: (1) existence of valid
and enforceable contract; (2) performance of contract
by plaintiff; (3) breach of contract by defendant; and
(4) a resulting injury to plaintiff.

**[3] Contracts 95 ☞1**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k1 k. Nature and Grounds of Contractual
Obligation. Most Cited Cases
Enforceable contract exists under Illinois law when
there are competent parties, a valid subject matter,
legal consideration, mutuality of obligation, and
mutuality of agreement, and when there is also a
meeting of minds about existence of contract and its
terms.

**[4] Contracts 95 ☞147(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k147 Intention of Parties
                95k147(1) k. In General. Most Cited
Cases
Under Illinois law, court's overriding concern in
construing a contract is to give effect to intent of
parties.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310 B.R. 905                                                                                           Page 2
310 B.R. 905
**(Cite as: 310 B.R. 905)**

**[5]** Contracts 95 ⌘147(2)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k147 Intention of Parties
                95k147(2) k. Language of Contract.
Most Cited Cases

**Contracts 95 ⌘175(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k175 Evidence to Aid Construction
                95k175(1) k. Presumptions. Most Cited
Cases
Under Illinois law, an agreement, when reduced to writing, must be presumed to speak intention of parties who signed it, and parties' intent must be determined from the language used.

**[6]** Contracts 95 ⌘143(1)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(1) k. In General. Most Cited
Cases
Illinois courts use "four corners" approach to contract interpretation pursuant to which they confine their attention to only that which appears within four corners of relevant document.

**[7]** Evidence 157 ⌘397(1)

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
            157k397 Contracts in General
                157k397(1) k. In General. Most Cited
Cases
In construing contract, Illinois courts may not consider evidence of either a prior agreement or a contemporary oral understanding that would belie the written document, except when contract is ambiguous.

**[8]** Contracts 95 ⌘143(2)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(2) k. Existence of Ambiguity.
Most Cited Cases
Under Illinois law, written instrument is "ambiguous" if the language used is reasonably susceptible to having more than one meaning.

**[9]** Contracts 95 ⌘143(2)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(2) k. Existence of Ambiguity.
Most Cited Cases

**Contracts 95 ⌘152**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k151 Language of Instrument
                95k152 k. In General. Most Cited Cases

**Contracts 95 ⌘176(2)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k176 Questions for Jury
                95k176(2) k. Ambiguity in General.
Most Cited Cases
Under Illinois law, contract which is susceptible to only one reasonable interpretation is "unambiguous," and court must determine its meaning as a matter of law and enforce its provisions according to their ordinary and plain meaning.

**[10]** Contracts 95 ⌘176(2)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310 B.R. 905
310 B.R. 905
**(Cite as: 310 B.R. 905)**

Page 3

[95k176](#) Questions for Jury
[95k176(2)](#) k. Ambiguity in General.
[Most Cited Cases](#)
Under Illinois law, whether a written contract is clear or ambiguous is question of law for court.

**[11] Contracts 95 ☞1**

[95](#) Contracts
    [95I](#) Requisites and Validity
        [95I(A)](#) Nature and Essentials in General
            [95k1](#) k. Nature and Grounds of Contractual Obligation. [Most Cited Cases](#)

**Evidence 157 ☞397(3)**

[157](#) Evidence
    [157XI](#) Parol or Extrinsic Evidence Affecting Writings
        [157XI(A)](#) Contradicting, Varying, or Adding to Terms of Written Instrument
            [157k397](#) Contracts in General
                [157k397(3)](#) k. What Constitutes Contract Excluding Parol Evidence in General. [Most Cited Cases](#)
Under Illinois law, parties who had entered into contract with printing company for production of inaugural issue of new magazine were bound by unambiguous terms of their written contract, and could not introduce evidence of any contrary representations allegedly made during contract negotiations, where parties, who had access to and actually consulted with attorney before they executed agreement, had opportunity to read agreement and to understand what they were signing, and where contract contained integration clause.

**[12] Contracts 95 ☞175(1)**

[95](#) Contracts
    [95II](#) Construction and Operation
        [95II(A)](#) General Rules of Construction
            [95k175](#) Evidence to Aid Construction
                [95k175(1)](#) k. Presumptions. [Most Cited Cases](#)

**Contracts 95 ☞245(1)**

[95](#) Contracts
    [95III](#) Modification and Merger

[95k245](#) Merger in Subsequent Contract
    [95k245(1)](#) k. In General. [Most Cited Cases](#)
Under Illinois law, written contracts are presumptively complete in and of themselves, and this presumption is even stronger when contract contains an integration clause.

**[13] Contracts 95 ☞245(1)**

[95](#) Contracts
    [95III](#) Modification and Merger
        [95k245](#) Merger in Subsequent Contract
            [95k245(1)](#) k. In General. [Most Cited Cases](#)
Under Illinois law, purpose of merger or integration clause is to make written agreement the exclusive statement of contracting parties' obligations and rights.

**[14] Contracts 95 ☞245(1)**

[95](#) Contracts
    [95III](#) Modification and Merger
        [95k245](#) Merger in Subsequent Contract
            [95k245(1)](#) k. In General. [Most Cited Cases](#)
Under Illinois law, parties that formally incorporate merger clause in their contract explicitly manifest their intention to protect themselves against misinterpretations which might arise from extrinsic evidence.

**[15] Contracts 95 ☞175(1)**

[95](#) Contracts
    [95II](#) Construction and Operation
        [95II(A)](#) General Rules of Construction
            [95k175](#) Evidence to Aid Construction
                [95k175(1)](#) k. Presumptions. [Most Cited Cases](#)
Under Illinois law, courts presume that each provision in contract was inserted deliberately and for a reason.

**[16] Contracts 95 ☞93(2)**

[95](#) Contracts
    [95I](#) Requisites and Validity
        [95I(E)](#) Validity of Assent
            [95k93](#) Mistake
                [95k93(2)](#) k. Signing in Ignorance of Contents in General. [Most Cited Cases](#)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310 B.R. 905
310 B.R. 905
**(Cite as: 310 B.R. 905)**

Under Illinois law, party is not justified in relying on representations outside of, or contrary to, written terms of contract that he or she signs when party is aware of nature of contract and has full opportunity to read it.

**[17]** Contracts 95 ☜93(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k93 Mistake
            95k93(1) k. In General. Most Cited Cases

Contracts 95 ☜94(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k94 Fraud and Misrepresentation
            95k94(1) k. In General. Most Cited Cases

Contracts 95 ☜95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
            95k95(1) k. In General. Most Cited Cases
Under Illinois law, contract can be voided where its execution was obtained through illegality, mistake, fraud or duress.

**[18]** Contracts 95 ☜95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
            95k95(1) k. In General. Most Cited Cases
Under Illinois law, economic duress is a recognized affirmative defense to contract action, on which defendant bears burden of persuasion.

**[19]** Contracts 95 ☜95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
            95k95(1) k. In General. Most Cited Cases
"Economic **duress** ," such as will provide basis to invalidate a contract under Illinois law, includes oppression, undue influence, imposition, or taking of undue advantage of the business or financial stress or extreme weakness or necessities of another, such that his free agency is overcome.

**[20]** Contracts 95 ☜95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
            95k95(1) k. In General. Most Cited Cases

Contracts 95 ☜95(3)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
            95k95(3) k. Threats in General. Most Cited Cases
Under Illinois law, in order to invalidate a contract based on economic duress, party must show that it was (1) induced by a wrongful act or threat of another to execute that contract, (2) under circumstances that deprived party of its free will.

**[21]** Contracts 95 ☜95(1)

95 Contracts
   95I Requisites and Validity
      95I(E) Validity of Assent
         95k95 Duress
            95k95(1) k. In General. Most Cited Cases
Wrongful acts that can constitute "economic **duress** ," such as will provide basis to invalidate contract under Illinois law, include not only those that are tortious, criminal or violative of contractual duty, but also acts that are wrongful in moral sense.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310 B.R. 905
310 B.R. 905                                                                    Page 5
**(Cite as: 310 B.R. 905)**

**[22] Contracts 95 🖘95(3)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(3) k. Threats in General. Most
Cited Cases
It is not wrongful for party to contract to threaten to
do something that he or she has legal right to do, and
such threats will not provide a basis under Illinois
law for invalidating contract on "economic **duress** "
theory.

**[23] Contracts 95 🖘95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited
Cases
Unless wrongful or unlawful pressure is exerted,
there is no "economic **duress** ," such as will provide
basis for invalidating contract under Illinois law.

**[24] Contracts 95 🖘95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited
Cases
Under Illinois law, parties who had entered into
contract with printing company for production of
inaugural issue of new magazine failed to satisfy
their burden of proving that contract should be
invalidated for economic duress, despite alleged
disparity in economic power between these would-be
publishers of fledgling magazine and established
printing company, and notwithstanding that company
may have engaged in hard dealing in extracting the
terms it did for production and delivery of magazines
in time to satisfy the publishers' distribution
schedules, where would-be publishers acted in their
own economic self-interest in voluntarily entering
into contract, and where evidence indicated that they
had access to, and actually consulted with, attorney

before they executed agreement, and were fully
aware of what they were signing.

**[25] Contracts 95 🖘95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited
Cases
One party cannot charge the other party to contract
with "economic **duress** ," such as will provide basis
for invalidating contract under Illinois law, simply
because its consent to contract was obtained as result
of hard bargaining positions or the pressure of
financial circumstances.

**[26] Contracts 95 🖘95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited
Cases
"**Duress** " does not exist, such as will provide basis
to invalidate contract under Illinois law, where
business stress or financial pressure is result of
party's own decisions and general economic
conditions.

**[27] Contracts 95 🖘95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress
         95k95(1) k. In General. Most Cited
Cases
Under Illinois law, court may not rely on disparity in
size of parties entering into agreement in order to find
"economic **duress** ."

**[28] Contracts 95 🖘95(1)**

95 Contracts
   95I Requisites and Validity
     95I(E) Validity of Assent
       95k95 Duress

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

310 B.R. 905
310 B.R. 905
**(Cite as: 310 B.R. 905)**

95k95(1) k. In General. Most Cited Cases

Mere presence of economic power, without some wrongful use of that power, does not in itself constitute "economic **duress** ," such as will provide basis for invalidating contract under Illinois law.

**[29] Contracts 95 🔑322(3)**

95 Contracts
   95V Performance or Breach
      95k322 Evidence
         95k322(3) k. Weight and Sufficiency in General. Most Cited Cases

In cause of action by printing company to recover from customers for their alleged breach of contract in failing to make payments required for magazine production work, evidence was sufficient to establish that printing company had fulfilled its own contractual obligations by printing enough pages for production of 12,000 magazines and by delivering those pages for binding by date specified in parties' agreement, given testimony that it was industry practice for companies to print more than enough pages, to account for waste in production process, and that company had actually printed 12.5 percent more pages than were required by agreement, and given that packing slip indicated that pages were delivered in timely fashion.

**[30] Damages 115 🔑62(4)**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
         115k62 Duty of Person Injured to Prevent or Reduce Damage
            115k62(4) k. Breach of Contract. Most Cited Cases

Under Illinois law, doctrine of mitigation of damages requires the non-breaching party to contract to exercise reasonable diligence to avoid its losses from other party's breach.

**[31] Damages 115 🔑62(4)**

115 Damages
   115III Grounds and Subjects of Compensatory

Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
         115k62 Duty of Person Injured to Prevent or Reduce Damage
            115k62(4) k. Breach of Contract. Most Cited Cases

Under Illinois doctrine of mitigation of damages, if contracting party allows its damages to be unnecessarily increased, the loss that was avoidable by performance of that party's duty to mitigate falls upon that party.

**[32] Damages 115 🔑163(2)**

115 Damages
   115IX Evidence
      115k163 Presumptions and Burden of Proof
         115k163(2) k. Mitigation of Damages and Reduction of Loss. Most Cited Cases

**Damages 115 🔑189**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k189 k. Breach of Contract in General. Most Cited Cases

Under Illinois law, customers who breached their contract to pay for magazine production work had burden of proof on their mitigation of damages defense, and where they merely asserted defense in conclusory fashion without presenting any evidence thereon, any such defense failed.

**[33] Contracts 95 🔑322(3)**

95 Contracts
   95V Performance or Breach
      95k322 Evidence
         95k322(3) k. Weight and Sufficiency in General. Most Cited Cases

In a cause of action by printing company to recover from customers for their alleged breach of contract in failing to make payments required for magazine pages that company had produced and timely delivered for binding, customers failed to satisfy burden of showing, as required to support to support their counterclaim, that company had breached its own contractual obligation to perform work in good

and workmanlike fashion, based on evidence that pages of magazines had fallen out after they were distributed; while parties did not dispute that magazines were improperly bound, printing company's representative testified that company had nothing to do with binding process, and company was not required to bind pages pursuant to terms of parties' agreement.

**\*909** Jeffrey C. Dan, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Debtor/Plaintiff.

Darryl Tom, Burris, Wright, Slaughter & Tom, LLC, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

These matters come before the Court on the complaint of Pre-Press Graphics Company, Inc. ("Pre-Press") for breach of contract and enforcement of guaranty against Brides Noir, LLC, Dana Powell, and Shannon Bonner (collectively, "Defendants") and on Defendants' counterclaim for breach of contract against Pre-Press. After conducting a bench trial, examining the admitted exhibits, and reviewing the testimony, the Court finds that the contract at issue is valid and enforceable, that Pre-Press satisfied its obligations under the agreement, and that Defendants failed to perform all of their contractual duties. Accordingly, the Court enters judgment in favor of Pre-Press, dismisses Defendants' counterclaim, and orders Defendants to pay Pre-Press the aggregate sum of $38,467.00, the amount due and owing under the relevant contractual agreement.

### I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. These are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (O).

### II. *FACTS AND BACKGROUND*

Pre-Press Graphics Company, Inc., doing business as R & B Group, operates a film imaging and printing business. On March 4, 2002, Pre-Press filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Compl. at ¶ 5. Subsequently, in

July 2002, Dana Powell ("Powell") and Shannon Bonner ("Bonner") met with Pre-Press sales account representative Dana Kurth [FN1] to discuss the publication of their inaugural issue of *Brides Noir,* a bridal magazine designed to address the needs and interests of African American women. Joint Pre-Trial Statement at p. 4. Brides Noir, LLC ("Brides Noir") is a limited liability corporation organized under the laws of the state of Illinois. Compl. at ¶ 7. Powell and Bonner are members and co-owners of Brides Noir and responsible for the operation and business affairs of the company. *Id.* at ¶ 8.

> FN1. In the parties' joint pre-trial statement, Defendants note that the Pre-Press sales representative's name is Dana Kurtz. *See* Joint Pre-Trial Statement at p. 4. However, in a letter dated November 25, 2002 to Bonner from Pre-Press president Robert Beevers, the sales employee is referred to as Dana Kurth. *See* Pre-Press's Ex. & Witness List, Ex. C. Because the account representative is employed by Pre-Press, the Court presumes that Pre-Press has accurately identified her.

The parties acknowledge that they reached some sort of oral agreement prior to the signing of a written contract in October, although they dispute the precise terms of that oral arrangement. According to Defendants, the parties orally agreed that Defendants would remit three installment payments of $10,000.00 each, to be paid 60, 90, and 120 days of delivery, in exchange for 12,000 152-page magazines, which Pre-Press was to print, bind, and distribute to locations specified by Defendants by October 4, 2002. Joint Pre-Trial Statement at p. 4. In contrast, the recital portion of the subsequently executed written contract states that the parties orally agreed that the total cost for both printing **\*910** and binding the magazines would be $43,304.00, payable in three installments of $14,434.67, $14,434.67, and $14,434.66 within 60, 90, and 120 days of distribution.[FN2] Compl., Ex. A, Agreement, at p. 1.

> FN2. The Court cannot definitively attribute the statements in the recital section of the written contract to Pre-Press, because, remarkably, the parties dispute the identity of the drafter of the written contract. At trial, Robert Beevers, president of Pre-Press,

testified that the attorney for Brides Noir prepared the document. Subsequently, Bonner stated under oath that counsel for Defendants did not draw up the contract. In any case, the exact terms of the oral agreement have no bearing on the resolution of this matter, as discussed below.

On or around September 27, 2002, Pre-Press president Robert Beevers ("Beevers") called for a meeting with Powell and Bonner, at which time he asked for partial payment before completing the magazine production work. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 3, ¶ 3. Shortly thereafter, on October 1, 2002, Beevers presented Defendants with a written Printing and Distribution Agreement (the "Agreement"), which differed from the prior oral arrangement in several ways. Id. at ¶ 4. Specifically, the Agreement provided that Pre-Press would print the magazine pages but that another firm, Booklet Binding, Inc. ("Booklet"), would do the binding:

Seller [ (Pre-Press) ] shall print, including prepress assemble and pagination from supplied keyline with high res images placed, one set of fiery proofs and one set of final proofs for approval, bindery trim, score, fold, perfect bound, blow in subscription card and carton, and deliver the Magazines no later than 1:00 p.m. on October 2, 2002, to Booklet Binding, Inc.....

Compl., Ex. A, Agreement, at p. 1.

In addition, the payment terms provided for under the Agreement deviated from those that the parties had allegedly agreed to orally. First, pursuant to the Agreement, Pre-Press was to receive $39,467.00 for printing the magazine pages. Id. at p. 2. Further, Defendants were required to remit a "good faith payment" of $1,000.00 upon the signing of the Agreement, with the balance to be paid in three installments of $12,822.34, $12,822.33, and $12,822.33 in 60, 90, and 120 days after delivery of the magazines to the binding company. Id. Finally, the Agreement indicated that the total cost for binding the magazines was $4,137.00, which Defendants were to pay directly to Booklet. Id.

As of or on October 2, 2002, the parties executed the contract, with Beevers and company vice president Michael Zienty signing for Pre-Press and Powell and Bonner signing on behalf of Brides Noir. Compl. at ¶ 9 & Ex. A, Agreement, at p. 4. On the same day, Powell and Bonner executed a personal guaranty (the "Guaranty"), which provided that each of them "guarantee[d] the obligations of Buyer [(Brides Noir)] under the foregoing Agreement, subject to any defenses available to Buyer." Compl., Ex. A, Guaranty, at p. 5. They also made a $1,000.00 deposit as required under the Agreement. Compl. at ¶ 13.

The parties dispute the events that occurred on October 2 and 3, 2002. Pre-Press contends that the magazines were printed and delivered to Booklet by 1:00 p.m. on October 2, 2002 as required pursuant the Agreement. Compl. at ¶ 12; Joint Pre-Trial Statement at p. 2. Defendants admit that the pages were delivered to the bindery on October 2 as promised; however, they claim that Pre-Press subsequently took the magazines back and redelivered them on October 3, 2002, only after Defendants had signed the contract. Defendants'*911 Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 3, ¶ 6; Joint PreTrial Statement at p. 5. They further allege that this delay in delivery caused the glue to set improperly and that, accordingly, all of the magazines were defectively bound and fell apart, resulting in lost subscription revenue, lost profits, and loss of goodwill. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 3, ¶ 7. Both parties agree that Defendants never paid the balance due to Pre-Press under the written Agreement. Answer at ¶ 15. According to Defendants, their distributors expected 10,000 copies of the magazine by October 4, 2002 for national distribution; the remaining two thousand were needed for purposes of promotion at Defendants' launch party on the same day, as well as for subscription fulfillment. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at p. 2, ¶ 2. Despite the fulfillment requirement, Defendants assert that enough pages for only 11,756 magazines were delivered for binding, leaving them 244 books short. Id. at ¶ 8.

On October 24, 2003, Pre-Press filed a two-count complaint for breach of contract and enforcement of guaranty, seeking payment from Defendants of $38,467.00, the amount due and owing pursuant to the Agreement. Subsequently, on November 25,

2003, Defendants filed their answer, asserting three affirmative defenses.[FN3] Almost two weeks later, on December 8, 2003, Defendants filed a counterclaim for breach of contract against Pre-Press. They contend that Pre-Press breached the Agreement by failing to deliver to Booklet a sufficient number of pages for the binding of 12,000 magazines and by neglecting to immediately refund Defendants' $1,000.00 deposit. Counterclaim at ¶ 6. Defendants also suggest that Pre-Press failed to perform "in a good and workmanlike fashion consistent with customary standards of quality" as required under the Agreement. They claim that their damages exceed $40,000.00. Defendants' Ex. & Witness List & Proposed Findings of Fact and Conclusions of Law at pp. 3-4, ¶¶ 8-11. A trial was held before the Court on May 6, 2004.

> FN3. The three affirmative defenses are as follows:
> (1) Pre-Press breached the Agreement.
> (2) Pre-Press failed to mitigate its damages.
> (3) The Agreement and Guaranty are void as Defendants signed the Agreement and Guaranty under threat of economic duress by Pre-Press.
> Answer at p. 8.

### III. *DISCUSSION*

[1] State law determines the rules governing contractual disputes. *N.Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 652 (7th Cir.1998) (citations omitted). The Agreement in this matter expressly states that it is governed by the laws of the state of Illinois,[FN4] and the parties do not contest that Illinois contract law controls.[FN5] Thus, the Court looks to Illinois law in resolving the instant dispute. *See Freund v. E.D. & F. Man Int'l, Inc.,* 199 F.3d 382, 383 (7th Cir.1999) (applying the law of the state **\*912** that the parties agreed controlled the contract).

> FN4. The applicable provision of the contract reads as follows: "This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Illinois, and all rights and remedies shall be determined under such laws, without regard to principles of conflict of laws." Compl., Ex. A, Agreement, at ¶ 8.

> FN5. In fact, Pre-Press has failed to cite *any*

law, Illinois or otherwise, in support of its allegations. Defendants cite and rely on only two cases in asserting the affirmative defense of economic duress, both of which come from the Seventh Circuit. *See* Defendants' Ex. & Witness List & Proposed Findings of Fact & Conclusions of Law at p. 4.

[2] Pre-Press's complaint contends that the Agreement and Guaranty are valid contracts, which Defendants breached by failing to pay the amount owed for the magazine production work performed by Pre-Press. Under well-settled Illinois law, an action for breach of contract requires proof of four elements: (1) the existence of a valid and enforceable contract; (2) performance of the contract by the plaintiff; (3) breach by the defendant; and (4) a resulting injury to the plaintiff. *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.,* 218 F.Supp.2d 974, 976 (N.D.Ill.2002) (citing *Priebe v. Autobarn, Ltd.,* 240 F.3d 584, 587 (7th Cir.2001)); *Applied Indus. Materials Corp. v. Mallinckrodt, Inc.,* 102 F.Supp.2d 934, 937 (N.D.Ill.2000) (citations omitted); *Henderson-Smith & Assoc., Inc. v. Nahamani Family Serv. Ctr., Inc.,* 323 Ill.App.3d 15, 256 Ill.Dec. 488, 752 N.E.2d 33, 43 (Ill.App.Ct.2001) (citation omitted). Accordingly, in order to prove a prima facie breach of contract claim, Pre-Press must show that the Agreement and Guaranty were valid contracts; that Pre-Press performed its contractual duties; that Defendants failed to meet their obligations under the Agreement; and that Pre-Press suffered damages as a result of Defendants' breach.[FN6] *See Intervisual Communications, Inc., v. Volkert,* 975 F.Supp. 1092, 1099 (N.D.Ill.1997) (citation omitted).

> FN6. The enforceability of the Guaranty executed by Powell and Bonner is entirely dependent on the validity of the Agreement. Accordingly, the Court confines its attention and analysis to the validity of the Agreement.

The parties do not contest two of the four breach of contract requirements in this matter. Specifically, the third element, breach by Defendants, is not in dispute. According to the terms of the Agreement, Defendants were to provide Pre-Press with an earnest money payment of $1,000.00 upon execution of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract, with the balance to be paid in three subsequent installments:

(b) Upon the signing of this Agreement, Buyer [ (Brides Noir) ] shall make to Seller [ (Pre-Press) ], via check, a good faith payment for application to the ... Total Cost in the amount of one thousand dollars ($1,000). This one thousand dollar ($1,000) payment shall be deducted from the ... Total Cost....

(c) The balance of the ... Total Cost ... shall be paid by Buyer in three installment payments, the first payment of twelve thousand eight hundred twenty-two dollars thirty-four cents ($12,822.34) being due sixty (60) days after the Magazines are delivered to Booklet by Seller (the "*New Payment Date*"), the second payment of twelve thousand eight hundred twenty-two dollars thirty-three cents ($12,822.33) being due ninety (90) days after the New Payment Date and the third and final payment of twelve thousand eight hundred twenty-two dollars thirty-three cents ($12,822.33) being due one hundred twenty days (120) after the New Payment Date.

Compl., Ex. A, Agreement, at ¶ 2. The parties on both sides acknowledge that Defendants made the required good-faith payment of $1,000.00 after signing the Agreement. Answer at ¶ 13. It is also uncontested that Defendants never paid Pre-Press the balance of $38,467.00 for the magazine production work. *Id.* at ¶ 15. Accordingly, Defendants breached the Agreement by failing to pay any of the balance due.

Similarly, the parties do not contest that Pre-Press was injured as a result of Defendants' breach. At trial, Beevers testified**913** -and Defendants do not dispute-that Pre-Press suffered monetary damages by reason of Defendants' failure to pay for the printed magazine pages delivered to the binder. Specifically, Beevers asserted that Pre-Press incurred various costs in connection with the production of the pages, including out-of-pocket expenses, shipping costs, direct labor expenditures, and outlays for paper, ink, chemicals, plates, and film. Thus, Pre-Press has established that Defendants' breach caused injury to the printing company.

In contrast, the validity of the Agreement and the question of whether Pre-Press performed its obligations under the contract are very much in dispute. The Court examines each of these elements in turn.

## A. The Validity of the Agreement

[3] It is well-settled in Illinois that formation of a contract requires an offer, acceptance, and consideration. *Church Mut. Ins. Co. v. Mount Calvary Baptist Church (In re Mount Calvary Baptist Church),* 162 B.R. 181, 184 (Bankr.N.D.Ill.1993) (citation omitted). More specifically, an enforceable agreement exists when the following requirements have been satisfied: valid subject matter, competent parties, legal consideration, mutuality of obligation, and mutuality of agreement. *Longview Aluminum, L.L.C. v. United Steel Workers of Am.,* 213 F.Supp.2d 876, 879-80 (N.D.Ill.2002) (citation omitted). Further, Illinois courts hold that a valid contract is one whose essential terms are certain and definite. *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* No. 91-C-6103, 1994 WL 687579, at *17 (N.D.Ill. Dec. 7, 1994) (citing *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 113 Ill.Dec. 252, 515 N.E.2d 61, 65 (1987)). Finally, there must be a meeting of the minds about the existence of a contract, as well as its terms. *Mount Calvary Baptist Church,* 162 B.R. at 184 (citation omitted).

The parties do not dispute that the Agreement meets most of the requirements of a contract, but they vigorously contest whether there was mutuality of agreement. That is, Defendants contend that the oral understanding that the parties allegedly reached prior to the execution of the written contract reflects the terms to which they actually agreed. Defendants suggest that because the Agreement materially alters the terms of the oral understanding, the written contract is legally invalid. In addition, Defendants claim that both the Agreement and the Guaranty are void, because Defendants signed them under the threat of economic duress by Pre-Press.

## 1. Material Alteration of the Oral Agreement

[4][5][6][7] In the examination of contracts, the overriding concern is to give effect to the intent of the parties. *Church v. Gen. Motors Corp.,* 74 F.3d 795, 799 (7th Cir.1996) (citation omitted). Conventional contract principles in Illinois require that " '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

language used.' " *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 394 (7th Cir.2003) (*citing W. Ill. Oil Co. v. Thompson,* 26 Ill.2d 287, 186 N.E.2d 285, 287 (1962)); *Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (1999) (citation omitted). Accordingly, Illinois courts use the "four corners" approach to contract interpretation, confining their attention to only that which appears within the four corners of the relevant document. **914*Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir.1998) (citation omitted); *see also Neuma, Inc. v. AMP, Inc.,* 259 F.3d 864, 873-74 (7th Cir.2001) (citation omitted) (finding that if a contract is unambiguous, a court "will not look beyond its 'four corners' in interpreting its meaning"). In construing a contract, a court may not consider evidence of either a prior agreement or a contemporary oral understanding that would belie the written document. *Cromeens,* 349 F.3d at 394 (citation omitted).

[8][9] The only exception to this rule is applied in situations in which a contract is ambiguous. *Id.* (citation omitted). A written instrument is ambiguous if the language used is reasonably susceptible to having more than one meaning. *Thomas v. Pearle Vision, Inc.,* 251 F.3d 1132, 1137-38 (7th Cir.2001) (citations omitted); *Bourke,* 159 F.3d at 1036 (citation omitted); *Cent. States, S.E. & S.W. Areas Pension Fund v. Kroger Co.,* 73 F.3d 727, 732 (7th Cir.1996) (citation omitted) ("When parties suggest different, yet reasonable interpretations of a contract, the contract is ambiguous."); *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 565 (7th Cir.1995) (citation omitted) ("[A] contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract."). In contrast, a contract that is susceptible to only one reasonable interpretation is unambiguous, and a court must determine its meaning as a matter of law. *Moriarty v. Svec,* 164 F.3d 323, 330 (7th Cir.1998) (citation omitted); *Murphy,* 61 F.3d at 565 (citation omitted). Where a contract's provisions are clear, a court will enforce them according to their ordinary and plain meaning. *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.,* 225 F.3d 876, 879 (7th Cir.2000) (citation omitted); *Grun v. Pneumo Abex Corp.,* 163 F.3d 411, 420 (7th Cir.1998) (citation omitted); *Bourke,* 159 F.3d at 1036 (citation omitted).

[10] Applying these well-established contract principles, the threshold inquiry is whether the controlling contractual document in this matter is clear or ambiguous. It is well established that this determination is a question of law. *Houben v. Telular Corp.,* 231 F.3d 1066, 1072 (7th Cir.2000) (citation omitted); *Tingstol Co. v. Rainbow Sales Inc.,* 218 F.3d 770, 772 (7th Cir.2000) (citations omitted).

[11] In the present matter, the Court finds that the Agreement is facially clear, complete, and unambiguous. The contract begins by indicating the date of the Agreement and identifying the parties executing it. The provisions that follow include straightforward, direct language clearly setting forth the mutual obligations of both parties, as well as various other contractual terms and conditions not at issue here. *See* Compl., Ex. A, Agreement.

Particularly pertinent to the matter at bar, the Agreement also contains several provisions that directly or impliedly concern the oral understanding purportedly reached by the parties. Specifically, the recital section delineates the terms of the oral agreement, including the performance and payment obligations of the parties. *Id.* at p. 1. Of particular significance are the two provisions that conclude the section:

WHEREAS, the Parties desire to change the terms of their oral agreement and memorialize their agreement in its entirety as provided herein.
NOW, THEREFORE, in consideration of the mutual agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**915*Id.*These provisions, while acknowledging the existence of a prior oral arrangement, explicitly state the parties' intent to alter the terms of that arrangement and expressly assert that the parties have mutually agreed to the terms of the written contract.

[12][13][14] Moreover, the provision entitled "Entire Agreement" is an "integration" or "merger" clause that expressly provides that the contract represents the parties' entire agreement and all communications between them, whether oral or written.[FN7] "Written contracts are presumptively complete in and of themselves." *Bock v. Computer Assocs. Int'l, Inc.,* 257 F.3d 700, 707 (7th Cir.2001) (citation omitted). However, when an integration clause is present, this

presumption is all the more stronger. *Id.* (citation omitted). Indeed, the very purpose of a merger clause is to make the written agreement the exclusive statement of the parties' obligations and rights. *Anheuser-Busch, Inc. v. Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, School, Sightseeing, Charter Bus Drivers, Gen. Promotions Employees, & Employees of Affiliated Indus., Maltster, Laborers, Syrup, Yeast, Food, Vinegar, Brewery, Recycling & Miscellaneous Workers of Chi. & Vicinity, Ill., Local Union No. 744, Affiliated with the Int'l Bhd. of Teamsters,* 280 F.3d 1133, 1141 (7th Cir.2002) (citation omitted). Parties that formally incorporate a merger clause into their contract "explicitly [manifest] their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety,* 236 Ill.Dec. 8, 706 N.E.2d at 885.

> FN7. The "integration" clause reads as follows: "6. Entire Agreement. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior written or oral agreements and understandings between the Parties with respect to the subject matter hereof." Compl., Ex. A, Agreement, at pp. 2-3.

During contract negotiations, a party may propose terms, conditions, and provisions which are ultimately rejected in order to reach a compromise with the other party. That other party, of course, may do the same. The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement. Accordingly, considering extrinsic evidence of prior negotiations to create an "extrinsic ambiguity" where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null. *Id.* (emphasis in original).

[15] The added presence of the integration clause in this matter is further strong evidence that the parties intended the Agreement to be the complete and exclusive agreement between them. *See Longview Aluminum,* 213 F.Supp.2d at 880 (finding that an intent to be bound by a contract can be shown "by the inclusion of an explicit merger clause in the

agreement"). Along the same vein, the inclusion of the clause supports the contention that the parties desired the Agreement to be interpreted solely according to the language used in the final written contract. *See Air Safety,* 236 Ill.Dec. 8, 706 N.E.2d at 886. All parties were free to negotiate a contract without a merger clause, but they did not. Courts presume that each provision in a contract was inserted deliberately and for a reason. *Atl. Mut. Ins. Co. v. Metron Eng'g & Constr. Co.,* 83 F.3d 897, 900 (7th Cir.1996) (citation omitted).

[16] Because the face of the Agreement indicates no ambiguity with respect to the parties' intent that the contract be **\*916** the exclusive expression of their complete agreement, the signatories are bound by that writing. *See Robbins v. Lynch,* 836 F.2d 330, 331 (7th Cir.1988) (citations omitted); *Conway Corp. v. Ahlemeyer,* 754 F.Supp. 596, 601 (N.D.Ill.1990) (citation omitted) ("Because no ambiguity ... exists, 'the intention of the parties at the time the contract was entered into must be ascertained by the language utilized in the contract itself, not by the construction placed upon it by the parties.' "); *Int'l Ins. Co. v. Peabody Int'l Corp.,* 747 F.Supp. 477, 480 (N.D.Ill.1990) (citation omitted) (finding that when the language of an agreement is unequivocal, the signatory to the contract is bound by its ordinary meaning); *Basu v. Stelle,* 237 Ill.App.3d 113, 177 Ill.Dec. 879, 603 N.E.2d 1253, 1256 (Ill.App.Ct.1992). Defendants may not properly rely on the alleged oral agreement and thereby avoid their contractual obligations by claiming that they signed the Agreement with their fingers crossed behind their backs. *See Robbins,* 836 F.2d at 332. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens,* 349 F.3d at 394 (citation omitted).

In sum, after a thorough examination of the controlling document, the Court finds that the Agreement is without ambiguity and admits of no doubts or misunderstanding. Indeed, Defendants have urged only that the Court accept the terms of the oral agreement purportedly reached by the parties; they have not claimed that the Agreement's provisions are ambiguous.

"[W]hen the language employed [in a contract] is unequivocal, although the parties may have failed to

express their real intention, there being no room for construction, the legal effect of the instrument will be enforced as written. Intention of the parties is not to be determined from previous understandings or agreements, but must be ascertained from the instrument itself, which they execute as their final agreement; otherwise, written evidence of an agreement would amount to nothing."

*Eagle Fire Ins. Co. v. John Spry Lumber Co.,* Gen. No. 13,616, 138 Ill.App. 609, 1908 WL 1450, at *1 (Ill.App.Ct.1908) (quoting *Clark v. Mallory,* 185 Ill. 227, 56 N.E. 1099, 1100-01 (1900)). Accordingly, the Court rejects Defendants' contention that the parties' understanding was an agreement in principle, embodied by the oral agreement, but rather finds that the parties are bound by the written contract.

**2. Economic Duress**

[17][18][19][20] A contract can be voided where its execution was obtained through illegality, mistake, fraud, or duress. *Hurd v. Wildman, Harrold, Allen & Dixon,* 303 Ill.App.3d 84, 236 Ill.Dec. 482, 707 N.E.2d 609, 614 (Ill.App.Ct.1999) (citation omitted). As such, Defendants contend that the Agreement and Guaranty at issue were executed under duress and are, therefore, unenforceable. It is well-settled that economic duress is a recognized affirmative defense to a contract action. *Resolution Trust Corp. v. Ruggiero,* 977 F.2d 309, 313 (7th Cir.1992) (citation omitted); *Fed. Deposit Ins. Corp. v. Linn,* 671 F.Supp. 547, 556 (N.D.Ill.1987) (citation omitted). Thus, Defendants bear the burden of persuasion. *Linn,* 671 F.Supp. at 551 (citation omitted). "Duress is a defense to obligations to which a party would not otherwise agree, were it not for the other party's wrongful and oppressive demands." *Id.* at 557 (citation omitted). More specifically, economic duress, also known as business compulsion, includes the oppression, undue influence, imposition, or taking of undue advantage of the business or financial**\*917** stress or extreme weakness or necessities of another, such that his "free agency is overcome." *Ficke v. Johns,* No. 95-C-939, 1996 WL 99424, at *4 (N.D.Ill. Mar. 4, 1996) (citations omitted); *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Stanley,* 606 F.Supp. 558, 562 (N.D.Ill.1985) (citation omitted). In Illinois, a contract executed under duress is voidable. *In re Dalip,* 194 B.R. 597, 601 (Bankr.N.D.Ill.1996). To invalidate a contract on the basis of economic duress,

a party must show that it was (1) induced by a wrongful act or threat of another to execute that contract, (2) under circumstances that deprived the party of its free will. *Riv Vil, Inc. v. Tucker,* 979 F.Supp. 645, 655 (N.D.Ill.1997) (citations omitted); *Westinghouse Elec. Corp. v. McLean,* 938 F.Supp. 487, 492-93 (N.D.Ill.1996) (citations omitted); *Hurd,* 236 Ill.Dec. 482, 707 N.E.2d at 614 (citations omitted).

[21][22][23] Wrongful acts that can constitute economic duress include not only those that are tortious, criminal, or violative of a contractual duty, but also acts that are wrongful in a moral sense. *Dalip,* 194 B.R. at 601 (citation omitted); *Alexander v. Standard Oil Co.,* 97 Ill.App.3d 809, 53 Ill.Dec. 194, 423 N.E.2d 578, 582 (Ill.App.Ct.1981) (citation omitted). However, "[i]t is not wrongful to threaten to do something that one has a legal right to do." *Riv Vil,* 979 F.Supp. at 656 (citing *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 582);*Thelin v. Mitchell,* 576 F.Supp. 1404, 1408 (N.D.Ill.1983) (citations omitted) (finding that a party's threat to assert its legal rights does not rise to the level of economic duress unless it involves some abuse of the legal process). Unless wrongful or unlawful pressure is exerted, there is no economic duress. *Hurd,* 236 Ill.Dec. 482, 707 N.E.2d at 615 (citation omitted); *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583 (citation omitted) (finding that a claim based on economic duress " 'cannot be predicated on a demand which is lawful or on the insistence of a legal right' ").

[24] Defendants claim that Pre-Press took advantage of the fact that Brides Noir was in serious economic straits, thereby inducing Powell and Bonner to sign both the Agreement and the Guaranty. At trial, Bonner testified that *Brides Noir* was a new publication and that, therefore, Defendants had limited funds. According to Bonner, Defendants decided to do business with Pre-Press precisely because the printing company provided Defendants with lenient credit terms and did not require a down payment before beginning production work on the magazine pages. Bonner testified that about a week before the October 4 launch party for the magazine, Beevers called an emergency meeting at which he asked for $10,000.00 up front before he would allow the rest of the pages to be printed, despite the terms to which the parties had purportedly agreed to orally. Bonner asserted that Defendants' attorney received

Page 14

the written contract from Beevers several days later and that she and Powell signed it only because they felt forced to reach some sort of agreement. Bonner also testified that Beevers subsequently told Defendants that he still would not print unless Powell and Bonner signed a personal guaranty.

[25] Neither this testimony nor any other evidence presented establishes any wrongful or unlawful conduct by Pre-Press. Pre-Press had the legal right to bargain for the best possible terms in exchange for its printing services, including demanding that Defendants sign a written contract and assume personal liability in connection with the payment of those services. Defendants should not have expected Pre-Press to perform without some **918 assurance that it would be paid. The fact that Pre-Press may have engaged in hard bargaining is not sufficient to constitute a wrongful act for purposes of establishing economic duress. *See Dalip,* 194 B.R. at 601-02. A party cannot charge another with economic duress where consent to an agreement is obtained as the result of hard bargaining positions or the pressure of financial circumstances. *Resolution Trust,* 977 F.2d at 314 (citation omitted) ("[T]he mere fact that one is in a difficult bargaining position due to desperate financial circumstances does not support a defense of economic duress."); *Dalip,* 194 B.R. at 602 (citation omitted); *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 582.

[26] Moreover, duress does not exist where business stress or financial pressure is the result of a party's own decisions and general economic conditions. *Resolution Trust,* 977 F.2d at 314; *Selmer Co. v. Blakeslee-Midwest Co.,* 704 F.2d 924, 928 (7th Cir.1983); *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583 (citation omitted). Defendants were completely aware of the terms to which they were agreeing under the written contract and the Guaranty. The concessions that they made were, undoubtedly, the result of hard bargaining by Pre-Press. However, if Defendants felt obligated to yield any rights to Pre-Press, that compulsion was caused by Defendants' own financial situation-not by Pre-Press's legitimate efforts to get concessions from them in return for Pre-Press's own concessions.

[27][28] Finally, the disparity of the parties' size, experience, or bargaining power does not support Defendants' contention that Pre-Press acted

wrongfully or unlawfully. Bonner testified at trial that she had no prior knowledge of publishing or magazine production at the time the events in this matter took place. In contrast, Beevers testified that he has worked at Pre-Press for 15 years. Nevertheless, Illinois courts have found that one cannot rely on disparity in size of the parties entering into an agreement to show economic duress. *Linn,* 671 F.Supp. at 560 ("Disparities in bargaining strength do not equate with-or even provide prima facie evidence of-coercion."); *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583. "The mere presence of economic power, without some wrongful use of that power, does not in and of itself constitute economic duress." *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583 (citations omitted).

In addition to having failed to show that Pre-Press engaged in any wrongdoing, Defendants are unable to establish that they were left "bereft of the quality of mind essential to the making of a contract." *Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583. Defendants suggest that they had no choice but to sign the Agreement and Guaranty in response to Pre-Press's demands. Although the Court does not doubt that Defendants were between a rock and a hard place when presented with the documents, the evidence indicates that they made a calculated, economic decision not to fight Pre-Press over the contractual terms. Instead, they entered into the written Agreement to ensure the production and delivery of the magazines both in satisfaction of their distributors' schedules and in time for the launch party celebrating the new publication. Defendants were motivated by economic self-interest-not the involuntary result of pressure. Proscribed economic duress does not exist when the party claiming the duress had a choice as to whether he would perform the act or do the thing said to have been done under duress. *Wittkoff v. USG Corp.,* No. 89-C-6004, 1989 WL 135242, at *2 (N.D.Ill. Oct. 24, 1989) (citation omitted).

**919 Further, the evidence indicates that Defendants were fully aware of what they were signing and that they had access to and consulted with an attorney before executing the Agreement. These factors, while not dispositive, are important in rebutting a claim of economic duress. *Linn,* 671 F.Supp. at 561 n. 34;*Alexander,* 53 Ill.Dec. 194, 423 N.E.2d at 583 (citation omitted).

310 B.R. 905                                                      Page 15
310 B.R. 905
**(Cite as: 310 B.R. 905)**

In sum, the facts of this matter do not present a situation of economic duress. That Defendants were not able to secure the terms that they desired through negotiation does not mean that they can now avoid their obligations under the written document by claiming that they agreed to the contract under economic duress. "In our free market system, it is not the function of the judiciary to measure economic adversaries' bargained concessions in retrospect." *Linn,* 671 F.Supp. at 561. Accordingly, the Court concludes that the Agreement and Guaranty are valid and enforceable, and Defendants are bound by the terms of the documents.

**B. Pre-Press's Performance of Its Contractual Obligations**

[29] The Court now turns to the other breach of contract element contested by the parties-whether Pre-Press performed its obligations under the Agreement. Pre-Press claims that it fulfilled its contractual obligations to the letter. In contrast, Defendants contend that Pre-Press breached the Agreement by producing an insufficient number of magazine pages and by failing to deliver those pages in a timely manner.[FN8]

> FN8. Pre-Press alleges in its complaint that "[t]he Debtor [ (Pre-Press) ] printed the magazines and delivered same on October 2, 2002." Compl. at ¶ 12. In copying this paragraph in order to respond to it, Defendants make two surprising and rather significant errors. That is, the allegation appears in Defendants' answer as follows: "The Debtor printed and bound the magazines and delivered same on October 4, 2002." Answer at ¶ 12. Defendants then provide an equally enigmatic answer: "Defendants admit that Plaintiff [ (Pre-Press) ] printed and bound a portion of the 12,000 magazines pursuant to the Agreement, but deny the remaining allegations contained in paragraph 12 of Plaintiff's Complaint." *Id.* Under the Agreement, Pre-Press was obligated only to print the pages-not to bind the magazines-and to deliver them to Booklet by October 2, 2002. At trial, the parties on both sides agreed that Pre-Press did not perform any

binding. They also acknowledged that the pages were delivered, at least initially, to Booklet on October 2, 2002. See the discussion that follows. The Court presumes that Defendants' references to Pre-Press binding the magazines and to October 4, 2002 are simply typographical and proofreading errors.

With respect to the number of pages produced, Defendants allege that Pre-Press breached the Agreement by failing to create and deliver to the bindery enough sheets for the production of 12,000 magazines. Bonner testified at trial that 10,000 of the magazines were sent to Defendants' distributors for national distribution. The remaining books were to be used for promotional purposes to generate interest, as well as for subscription fulfillment. Both Powell and Bonner testified that only 11,756 magazines were ultimately bound, leaving them short 244 books. As a result, Defendants allege that they were unable to fulfill all of their subscriptions.

Beevers testified at trial that Pre-Press did not produce enough pages for *exactly* 12,000 magazines. Instead, Beevers said, Pre-Press printed sheets for *more than* 12,000 books for all pages except the magazine cover and the subscription cards. He explained that it is industry standard to print more than enough sheets for "make-ready" when a fulfillment requirement is involved, because the production **\*920** process always entails some waste. According to Beevers, the standard and practice in the printing business is to produce five to 10 percent overage, depending on the complexity of the job, and he asserted that Pre-Press regularly conforms to this standard.[FN9] Beevers also testified that every page is counted by the printing press as it is created.

> FN9. Although Beevers offered evidence of printing industry standards and practices, Pre-Press did not identify or qualify him as an expert witness. Therefore, his testimony here should be used only to demonstrate his own experience, not to establish industry custom. *See Suncraft Techs., Inc. v. Zirkon Druckmaschinen GMBH,* No. 99-C-1456, 2000 WL 283970, at \*5 (N.D.Ill. Mar. 10, 2000). However, Defendants failed to object to Beevers as an expert witness. Further, other evidence, discussed below, validates

310 B.R. 905                                                                 Page 16
310 B.R. 905
**(Cite as: 310 B.R. 905)**

Beevers' contention that enough pages were created to produce more than 12,000 magazines. Thus, Pre-Press's failure to qualify Beevers as an expert witness is of no moment in this matter.

Pre-Press's Exhibit B, entitled "Shipper/Packing List," corroborates Beevers' testimony. *See* Pre-Press's Ex. & Witness List, Ex. B. Specifically, the document indicates that, with the exception of the cover and subscription cards, more than 12,000 sheets for all magazine pages were shipped to Booklet. In fact, the number of pages in excess of 12,000 for each of the nine forms ranged from 600 to 1,500 pages, representing five to 12.5 percent more than the required number under the Agreement.

The testimony of Elena Morena ("Morena") also bolsters Beevers' assertions. Employed by Booklet, Morena served as the customer service representative on the *Brides Noir* job. In discussing the binding sequence, she testified that after Booklet employees receive a job, they cut the forms, fold them, and then put them into the binder. Morena acknowledged that each process results in a certain amount of spoilage. A memo from Morena to Defendants, dated October 11, 2002, notes merely as follows: "Attached you will find your stock counts for the Brids (sic) Noir book[.] I have contacted Dana @ R & B Group regarding shortages." Beevers addressed these shortages in a letter sent to Bonner on November 25, 2002. The letter reads in pertinent part as follows:
As we discussed, all the sheets necessary to produce the required number of books were delivered to Booklet Binding and signed for by its representative. It is my understanding that Jack Mikolajczak and Dana Kurth have each spoken with Booklet employees who have acknowledged missing the target number of Brides Noir books to be bound. The Booklet employees have acknowledged, however, that the production shortage has everything to do with Booklet and nothing to do with R & B Group.

Pre-Press's Ex. & Witness List, Ex. C. In addition to following up on the problems related to the alleged shortages, Beevers told Defendants that Pre-Press was prepared to go back on press immediately and noted that he would "make every effort to keep [Defendants'] costs for ... a reprint to an absolute minimum." *Id.* In short, the documentary evidence corroborates Beevers' testimony and establishes that

Pre-Press not only provided a sufficient number of pages for the production of 12,000 magazines, but also attempted to ameliorate the shortage problems that occurred as a result of waste during the binding of the books.

The evidence in this matter also weighs in favor of Pre-Press with respect to whether the magazine pages were delivered to Booklet in a timely manner. Pre-Press asserts that the pages were printed and shipped to Booklet by 1:00 p.m. on October 2, 2002, in accordance with the Agreement. Beevers testified that the **\*921** sheets were delivered by truck-by Pre-Press's independent shipper-and accompanied by a packing slip. The packing slip indicates that the pages were received on October 2, 2002 ("10-2-02") at 12:35 p.m. ("12:35") and bears the signature of the Booklet employee who accepted the shipment. Pre-Press's Ex. & Witness List, Ex. B.

Defendants concede that the magazine pages were delivered on October 2. However, they contend that Pre-Press took the pages back and redelivered them on the following day, only after Defendants had executed the Agreement. Powell testified at trial that the magazines required 48 hours of "drying time" and that, therefore, they had to arrive at Booklet by October 2, in order to be bound and delivered by October 4. She further testified that when she arrived at the bindery on October 3 at 4:00 p.m., there was not a single copy of the magazine bound and ready. According to Powell, the Booklet employees claimed that they had "just gotten the sheets" and were in the process of gluing them at that time. Despite Defendants' allegation that Pre-Press removed the pages from Booklet's premises, Morena asserted just the opposite, stating in no uncertain terms that the pages brought to Booklet were never subsequently removed by Pre-Press.

In sum, the preponderance of the evidence in this matter establishes that Pre-Press created enough pages for the production of 12,000 magazines and that those pages were delivered to Booklet by 1:00 p.m. on October 2, 2002. Accordingly, the Court finds that Pre-Press met its obligations under the Agreement. Moreover, as Pre-Press has established all of the elements needed to prove its claim, the Court finds in favor of Pre-Press on its complaint for both breach of contract and enforcement of guaranty against Powell and Bonner.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## C. Mitigation of Damages

[30][31] As one of their affirmative defenses, Defendants assert that Pre-Press failed to mitigate its damages. Answer at p. 8. "The doctrine of mitigation of damages requires the non-breaching party to exercise reasonable diligence to avoid its losses." *Munoz v. Expedited Freight Sys., Inc.,* 775 F.Supp. 1181, 1190 (N.D.Ill.1991). If a party allows its damages to be unnecessarily increased, the loss that was avoidable by the performance of the party's duty falls upon that party. *Culligan Rock River Water Conditioning Co. v. Gearhart,* 111 Ill.App.3d 254, 66 Ill.Dec. 902, 443 N.E.2d 1065, 1068 (Ill.App.Ct.1982) (citations omitted). "In other words, losses which could have been reasonably avoided are not recoverable." *St. George Chi., Inc. v. George J. Murges & Assocs., Ltd.,* 296 Ill.App.3d 285, 230 Ill.Dec. 1013, 695 N.E.2d 503, 509 (Ill.App.Ct.1998) (citations omitted).

[32] Defendants bear the burden of establishing that Pre-Press failed to mitigate its damages. *See Riv Vil,* 979 F.Supp. at 660 (citation omitted). However, they have done no more than assert mitigation as an affirmative defense in their answer. As Defendants have not presented evidence from which the Court can conclude that Pre-Press failed to mitigate its damages, that affirmative defense fails.

## D. Defendants' Counterclaim

[33] Defendants have filed a counterclaim for breach of contract against Pre-Press. They contend that Pre-Press breached the Agreement by failing to deliver all 12,000 magazines to Booklet, by failing to provide Defendants with an immediate refund of their earnest money, and by generally failing to perform "in a **\*922** good and workmanlike fashion consistent with customary standards of quality."

According to the Agreement, Pre-Press was required to immediately return Defendants' earnest money deposit of $1,000.00 "[i]f the Magazines [were] not delivered to Booklet as specified" in the contract. Compl., Ex. A, Agreement, at p. 2. As discussed above, the Court has found that Pre-Press fulfilled its contractual obligations by delivering in a timely manner to Booklet a sufficient number of pages for the production of 12,000 magazines. Thus, Pre-Press

was not required to provide Defendants with a refund of their deposit.

Defendants' blanket claim that Pre-Press failed to perform competently is equally without merit. Defendants base their allegation on the following sentence of the Agreement: "The services of Seller [ (Pre-Press) ] hereunder shall be performed in a good and workmanlike fashion consistent with customary industry standards of quality." *Id.* Notwithstanding Defendants' sweeping contention, the evidence establishes that Pre-Press did, in fact, ably perform the printing services that it had agreed to provide under the contract. Indeed, the problem with the magazines arose from the binding of the pages into the finished product, not from the printing of the individual pages themselves.

Both Powell and Bonner testified at trial that the defect associated with the finished magazine was that the pages fell out. Booklet employee Morena substantiated Defendants' complaint by testifying that the spines of the magazines broke when Defendants looked through them and that the pages of any magazine will fall out if the spine is broken. Morena further testified that a seam was visible upon opening the first page of the magazine. Finally, Bonner testified that shortly after the books were distributed, Defendants received a "flood" of e-mail messages and telephone calls from people who said that the pages of their magazines had fallen out.

The parties do not dispute the fact that the finished magazines were improperly bound. However, neither Powell nor Bonner had any complaints about the visual appearance of the pages. Bonner even testified that she had gone to Pre-Press for various press checks and that she subsequently approved the pages that she saw.

Beevers testified that Pre-Press had nothing to do with the finishing of the magazines. Indeed, under the written Agreement, Pre-Press was not required to bind the pages, and, according to Beevers, the company is not even familiar with the gluing process. While the Court can sympathize with Powell and Bonner's anger, disappointment, and frustration with the finished product that they worked so hard to create, Defendants have taken aim at the wrong party by naming Pre-Press as the counter-defendant. Pre-Press performed its contractual obligations fully and

310 B.R. 905
310 B.R. 905
**(Cite as: 310 B.R. 905)**

Page 18

competently. Accordingly, Defendants' counterclaim is dismissed.[FN10]

> [FN10.] At trial, Defendants testified at length about the consequential damages they incurred as a result of Pre-Press's breach of contract. They allege that these damages include lost subscription revenue and lost goodwill. *See* Counterclaim at ¶ 7. As Defendants have been unable to prove that Pre-Press failed to perform under the Agreement, the Court need not further address the issue of damages.

## IV. *CONCLUSION*

For the foregoing reasons, the Court enters judgment in favor of Pre-Press, dismisses Defendants' counterclaim, and concludes that Defendants owe Pre-Press the aggregate sum of $38,467.00, the **\*923** amount due and owing under the written Agreement.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

### *ORDER*

For the reasons set forth in a Memorandum Opinion dated the 22nd day of June 2004, the Court enters judgment in favor of Pre-Press Graphics Company, Inc., dismisses the counterclaim of Brides Noir, LLC, Dana Powell and Shannon Bonner, and orders Brides Noir, LLC, Dana Powell and Shannon Bonner to pay Pre-Press Graphics Company, Inc. the aggregate sum of $38,467.00, the amount due and owing under the relevant contractual agreement.

Bkrtcy.N.D.Ill.,2004.
In re Pre-Press Graphics Co., Inc.
310 B.R. 905

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.